STATE OF NORTH CAROLINA, EX REL. NORTH CAROLINA UTILITIES COMMISSION v. WESTERN CAROLINA TELEPHONE COMPANY.

(Filed 30 October 1963.)

1. **Telephone Companies § 1;   Utilities Commission §§ 1, 6—**

The Utilities Commission is given general supervision over rates and services rendered by telephone companies and has the duty, either on its own motion or upon petition, to hold hearings to determine the just, reasonable and sufficient rates which such utilities may charge. G.S. 62-30, G.S. 62-72.

2. **Utilities Commission § 6—**

Where the petition of a telephone company for increase in rates states the proof upon which the company intends to rely, summarized with sufficient particularity to prevent the interested parties from being misled, the procedure, if the summary of the proposed evidence is too concise, is to permit an amendment rather than to dismiss the proceeding.

3. **Same;   Constitutional Law § 24—**

The Utilities Commission must determine a petition for an increase in rates on the basis of the facts existing at the time such increase is effective, and if a subsequent change in condition warrants a new rate, such new rate must relate to the date of change and the parties must be accorded an opportunity to be heard with respect to the effect, if any, such change had on the rate structure, and a denial of such opportunity would be a deprivation of due process.

4. **Utilities Commission § 6—**

Where at the time of the hearing of a petition for a telephone rate increase the Utilities Commission is apprized of the petitioner's intention to transfer certain of its exchanges to a subsidiary, and had in fact approved plans for such transfer, and the Commission notwithstanding denies motion to dismiss on the ground that such transfer would affect the rate structure, it is error for the Commission, almost six months after the termination of the hearing and some four months after the petitioner had transferred the exchanges, to grant the motion to dismiss the proceeding.

**5. Same—**

Where, a telephone company, during the pendency of its petition for an increase in rates, transfers part of its exchanges to a subsidiary, the Utilities Commission, in the exercise of its discretion, may make the subsidiary a formal party and treat the original petition as a joint petition for a uniform system of rates; or it may make the subsidiary a party and fix proper rates for the subsidiary's exchanges and for the original petitioner's exchanges.

**6. Utilities Commission § 1—**

Procedures before the Utilities Commission are not as strictly technical as proceedings in the Superior Court, and the Commission may regulate its own procedure within broad limits by rules and regulations not inconsistent with statutory provisions.

APPEAL by Western Carolina Telephone Company from *Walker,* S.J., February 1963 Civil Session of McDOWELL.

On 26 January 1962 Western Carolina Telephone Company (hereinafter petitioner) filed with the Utilities Commission its petition seeking permission to increase its rates—the proposed increase to become effective 1 March 1962.

It then owned and operated twenty telephone exchanges, nineteen located in the western part of North Carolina, the twentieth at Clayton, Ga. The petition, by exhibits attached, showed in detail the proposed changes, with estimated increases in revenues; the gross revenue derived from rates then in effect; operating expenses for the preceding years; and anticipated expenses, original cost of its properties, and depreciation claimed; a balance sheet for the period ending 30 September 1961; and the asserted "fair value rate base." It alleged the fair value of its properties in North Carolina was $6,680,000 which "is less than that which would be found if a cost study were made to determine Reproduction Cost New. Petitioner is also of the opinion that such fair value figure is less than that which would be calculated from a Trended Cost Study."

The Commission, on 5 February 1962, suspended the proposed increase in effect as permitted by G.S. 62-71. The Commission, by order dated 23 February 1962, permitted the increase to become effective upon Western's agreement to refund any amounts collected in excess of that authorized by the Commission. Petitioner agreed.

On 6 April 1962, 37 of petitioner's subscribers filed a protest to the proposed rate increase. They alleged the proposed rates were "unjust, unreasonable, excessive and discriminatory." They asked the Commission to refuse to authorize any increase.

Three days later protestants filed with the Commission a motion to dismiss, because: (1) petitioner had already been granted authority

"to sell and transfer to Westco Telephone Company certain of its North Carolina telephone properties, the effect of which is to materially and substantially alter the revenues, expenses, investment, accrued depreciation, and capitalization of the petitioner as presented in its Petition, rendering any determination of the probable earning capacity of the property of the Company under the particular rates proposed as required by G.S. 62-124, impossible;" (2) the petition did not state in sufficient detail, to comply with the Commission's rules, the proof which it intended to offer.

The Commission fixed the time to hear the motion to dismiss and, if denied, the petition for the increase in rates. It is stated in the opinion of the commissioner writing for the majority: "After hearing extended argument on the motion by all counsel at the scheduled date, time and place, protestants' Motion to Dismiss was denied by the Commission, two Commissioners voting to allow the motion. The matter then proceeded to hearing on the merits."

When all the evidence had been presented, protestants again moved to dismiss. The motion was denied.

The hearings terminated 27 April 1962. In June 1962 petitioner conveyed nine of its North Carolina exchanges to Westco, its subsidiary. This conveyance consummated plans of petitioner, made with the Commission's approbation, to extend telephone service to remote mountain areas.

On 4 October 1962 the Commission, with two commissioners dissenting, filed a lengthy opinion concluding with an order which allowed the motion to dismiss "without prejudice to petitioner to institute such new proceeding as it is advised."

Petitioner assigned errors and appealed to the Superior Court. It overruled all of petitioner's assignments of error and "affirmed and approved" the order of the Commission.

*Van Winkle, Walton, Buck & Wall by Herbert L. Hyde for appellant.*

*F. Kent Burns for appellees.*

RODMAN, J.   The reason usually given for the creation of quasi-judicial bodies is the assertion that they can expeditiously and economically resolve factual questions necessary for the proper disposition of special problems committed to them for decision.

The Utilities Commission is given general supervision over rates charged and services rendered by telephone companies. G.S. 62-30. It is the duty of the Commission on its own motion or upon complaint by

a patron or upon petition of a public utility to hold a hearing to determine "the just, reasonable and sufficient rates" which the utility may charge. G.S. 62-72.

In January 1962 petitioner applied to the Commission for permission to increase the rates charged for services rendered patrons of the nineteen North Carolina exchanges then owned and operated by it. This proposal to increase rates was challenged by patrons on procedural grounds as well as on the merits.

More than eight months after the petition was filed, after the motion to dismiss was denied, and after a full hearing on the merits, the proceeding was dismissed because of asserted procedural defects. Petitioner was told it might start anew. When the order dismissing the proceeding was filed, petitioner sought permission to correct the defects found to exist, by amending its petition and supplementing the evidence which it had offered. This request was denied. We are now called upon to determine whether the Commission acted properly in dismissing the proceeding, thereby denying the petitioner an opportunity to be heard with respect to the asserted defects.

The procedural challenge asserts two defects: (1) the petition did not comply with the rule of the Commission for that it did not set out in detail the evidence on which the petitioner would rely to establish its rate base, and (2) petitioner would shortly convey nine of its exchanges to a wholly owned subsidiary. Such conveyance would render "any determination of the probable earning capacity of the property of the company under the particular rates proposed as required by G.S. 62-124 impossible."

The Commission did not in its order specify which of the grounds assigned by protestants warranted the order of dismissal. However, we think it apparent from the opinion forming the basis of the order that it was not because of any defect in the form of the petition. It is nowhere suggested anyone was misled by the manner in which petitioner summarized the evidence it would offer. If the Commission had thought petitioner's summary of the evidence it intended to present too concise, the Commission would undoubtedly have permitted an amendment.

The second reason assigned for dismissing the petition is based on this factual situation: Petitioner's exchanges are located in small mountainous communities. The cost of maintaining existing lines and constructing new lines to serve additional customers is abnormally expensive. The areas served are sparsely settled. Petitioner could not obtain on the open market funds necessary to finance the construction of lines to provide adequate service to the areas adjacent to some of its

exchanges. To obtain funds to provide this service, petitioner had created a wholly owned subsidiary. Petitioner intended to convey nine of its exchanges to its subsidiary at a price fixed by the Commission. The subsidiary, Westco, would then borrow money from a governmental agency at a low rate of interest. The proceeds of the loan would be used to pay petitioner the purchase price of the properties to be conveyed. The balance of the loan would be used by Westco in improving and enlarging its facilities. The monies to be paid petitioner by Westco would be used to reduce petitioner's indebtedness. Steps had been taken by petitioner to accomplish the desired result prior to the filing of the petition for an increase in rates. All petitioner had done had the Commission's sanction. The Commission knew when it heard the petition for a rate increase what properties were to be conveyed, the value assigned to these properties, the amount Westco would borrow, and the rate of interest it would pay.

Protestants argued that the Commission could not, until the conveyance had been made and a reasonable time had elapsed, ascertain the revenues and expenses of the remaining exchanges necessary to determine a fair return to petitioner for the exchanges it would retain.

To this argument petitioner responded: It was seeking a uniform schedule of rates applicable to all nineteen exchanges. The rate increase, if granted prior to the conveyance to Westco, would apply to all exchanges because then owned by petitioner, and the Commission necessarily had to fix and authorize Western to charge a rate for all its exchanges, but when the conveyance was made, Westco would operate its exchanges at the same rates which petitioner was authorized to charge.

Whether it was proper for the Commission to hear evidence on the proposed rate increase for all nineteen exchanges when a sale of nine of the nineteen was imminent was raised by Commissioner Noah on 23 February, when he dissented from the order of the Commission permitting petitioner to obligate itself to refund any sums collected in excess of those authorized by the Commission. He called attention to the fact that the Commission had approved the contemplated conveyance to Westco, saying: "Westco would obtain a loan from the Rural Electrification Administration (REA). The loan has been approved and transfer of the properties from Western to Westco is being consummated." He stated the petition filed 26 January related to all the properties then owned by petitioner, and an order based thereon would prescribe the rates for the exchanges owned as well as the rates applicable to exchanges to be conveyed to Westco. He concluded: "I do not believe the undertaking or commitment of Western for itself and its subsid-

iary, Westco, to be a satisfactory arrangement for the protection of the public. I believe that Western, for itself, and Westco, for itself at the proper time, should furnish, as provided by G.S. 62-71, a satisfactory bond or bonds or in the alternative should deposit in escrow the differences in the present rates and the proposed rates which these companies would collect until the lawfulness of the increases are determined." Here then, before the motion to dismiss had been filed, was a definite recognition that the petitioner was acting not only to establish rates for the exchanges to be retained by petitioner but rates to be charged by Westco after the transfer was consummated.

At the time fixed for the hearing protestants argued their motion to dismiss. The chairman then announced: "Gentlemen, it is the opinion of the majority of the Commission that this Motion should be denied and we should hear your evidence."

This ruling was essentially a determination of the right of petitioner to seek an order applicable to all the exchanges, which order would bind Westco when the contemplated conveyance was consummated.

That the Commission and the parties so interpreted the ruling on the motion to dismiss is clearly indicated by the colloquy between Commissioner Peters and counsel for petitioner before any evidence with respect to values and rate base was offered: "COMMISSIONER PETERS: Mr. Walton, isn't it true that you came to the court room this morning to proceed to produce evidence relating to the entire properties of Western Carolina Telephone Company? MR. WALTON: Yes, sir. COMMISSIONER PETERS: And do these entire properties not include the properties which Western Carolina has proposed to own as well as what Westco is proposed to own, if and when the spinoff, so called, is ever consummated? MR. WALTON: That is correct. COMMISSIONER PETERS: What is to prevent our going ahead on that basis?"

This interpretation of the scope of the ruling is fortified by the announcement of the chairman when, at the conclusion of all evidence, he said in denying the motion to dismiss: "We are going to deny the Motion and give an Exception. We will take what has been presented by all who have testified here and do our best to render a just decision." No member of the Commission then dissented.

When the hearing ended, petitioner owned all nineteen exchanges. The challenged rates went into effect on 1 March. Petitioner was entitled to have the lawful rates fixed as of that date. Such a determination was necessary to ascertain what amount, if any, petitioner had illegally collected. The Commission could not consider events occurring subsequent to 1 March, the date the rates went into effect, to as-

certain what were proper rates on that date. True, a change in condition might warrant a new rate, but that rate would relate to the time the change occurred.

If the change of which the Commission takes notice occurs subsequent to the hearing, interested parties are entitled to notice that the Commission intends to fix a rate as of the date of the change. The parties must then be accorded an opportunity to be heard with respect to the effect, if any, the change has on the rate structure. A denial of that right would be a denial of the constitutional guarantee of due process. *Biddix v. Rex Mills*, 237 N.C. 660, 75 S.E. 2d 777; *English v. Long Beach*, 217 P. 2d 22, 18 A.L.R. 2d 547, and annotations; *Hill v. Casualty Co.*, 252 N.C. 649, 114 S.E. 2d 648; *Skipper v. Yow*, 249 N.C. 49, 105 S.E. 2d 205; 89 C.J.S. 352.

The Commission, in the exercise of its discretion, could have made Westco a formal party, thereby treating the original petition as a joint petition for a uniform system of rates, *Utilities Comm. v. State*, 250 N.C. 410, 109 S.E. 2d 368, or it could have made Westco a party and fixed proper rates for Westco's exchanges and for petitioner's exchanges. As said by *Moore, J.*, in *Utilities Comm. v. Area Development Co.*, 257 N.C. 560, 126 S.E. 2d 325: "Ordinarily, the procedure before the Commission is more or less informal, and is not as strict as in superior court, nor is it confined by technical rules; substance and not form is controlling. In the absence of statutory inhibition, the Commission may regulate its own procedure within broad limits, and may prescribe and adopt reasonable rules and regulations with respect thereto, provided such rules are consistent with the statutes governing its actions."

The judgment of the Superior Court is reversed. It will remand the cause to the Utilities Commission for further proceedings not inconsistent with the principles here declared.

Reversed.